The STATE of Ohio, Appellee,

v.

RANGEL, Appellant.

[Cite as *State v. Rangel* (2000), 140 Ohio App.3d 291.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000013.

Decided Sept. 29, 2000.

292

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Phillip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*McKinney & Namei Co., L.P.A.,* and *Firooz T. Namei,* for appellant.

SUNDERMANN, Judge.

Defendant-appellant Antonio Rangel was charged with falsification under R.C. 2921.13(A)(3), which states that "[n]o person shall knowingly make a false

statement, or knowingly swear or affirm the truth of a false statement previously made, when * * * [t]he statement is made with purpose to mislead a public official in performing the public official's official function." After a bench trial, Rangel was found guilty and sentenced as appears on record. Rangel now appeals, asserting two assignments of error, neither of which is well taken.

The evidence at trial established that Rangel, a citizen of Mexico, wanted to obtain a driver's license, so he went to an Ohio Bureau of Motor Vehicles ("BMV") branch and presented to the clerk, Rae Jean Whitaker, a Social Security card and a resident-alien card, known as a "green card," as evidence of his identification. Whitaker testified that she thought that the cards were fraudulent and notified her supervisor, Sandra Scott. Scott examined Rangel's Social Security card and green card. Scott testified that Rangel's picture on the green card did not cover the entire seal, which indicated to her that the card was fraudulent. Additionally, she testified that Rangel's Social Security card appeared to be fraudulent because it did not have raised pillars, ink dots, or a perforated edge. Scott stated that, based on her observations, she called the local police for assistance.

Officer Daniel Carter responded and took Rangel to the police district to fill out a suspect investigation report. While filling out the report, Officer Carter asked Rangel to state his date of birth. According to Officer Carter, Rangel replied that March 15, 1979, was his date of birth. Officer Carter further testified that the green card identified Rangel's date of birth as March 15, 1974. Rangel testified at trial that his date of birth was March 15, 1979. Rangel also testified that he had obtained the Social Security card and the green card from an unknown person at a shopping mall, but he denied that the cards were fraudulent.

■ In his first assignment of error, Rangel asserts that the trial court erred in allowing expert testimony as to the authenticity of the Social Security card and the green card, because Whitaker and Scott were not qualified as experts. Under Evid.R. 702, three requirements must be met for expert testimony to be admissible. First, the testimony must relate to matters beyond the knowledge or experience of lay persons or dispel a misconception common among lay persons.[1] Second, the witness must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."[2] And, third, the testimony must be "based on reliable scientific,

---

1. See Evid.R. 702(A).

2. Evid.R. 702(B).

technical, or other specialized information." [3] A trial court's admission of expert testimony will not be reversed absent an abuse of discretion.[4]

 The state never proffered Whitaker or Scott as an expert witness at trial, and it is unclear whether the court accepted them as experts. Regardless, the state argues that Evid.R. 702 is inapplicable because the authenticity of the Social Security card and the green card could have been established by lay opinion testimony. We disagree. A determination of whether a Social Security card or a green card is authentic does not fall within the common knowledge of a lay person. Further, the Social Security card and the green card in this case do not appear on their face to be fraudulent. Under the first prong of Evid.R. 702, expert testimony was required here. While it is preferable for the trial court to explicitly find that a witness qualifies as an expert, because the testimony of Whitaker and Scott related to knowledge beyond the scope of a lay person, we can infer from the record that the trial court considered them to be experts.[5] Therefore, the question before us is whether Whitaker and Scott were properly qualified as expert witnesses.

 The standards in Ohio relating to the admissibility of the opinion of an expert are relatively lenient as to a determination of who is an expert but relatively strict in governing the admissibility of the expert testimony. To qualify a witness as an expert under the second prong of Evid.R. 702, the court should consider the witness's knowledge, skill, experience, training, or education. An expert must only possess knowledge that will aid the trier of fact in assessing the evidence.[6] And the expert need not possess special education, certification, or complete knowledge of the field in question.[7] When applying the third prong of Evid.R. 702, the court must act as a "gatekeeper" to ensure that the proffered scientific, technical, or other specialized information is sufficiently reliable.[8]

3. Evid.R. 702(C).

4. See *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 148–149, 446 N.E.2d 444, 448.

5. See *State v. Gray* (Aug. 19, 1988), Lucas App. No. L–87–393, unreported, 1988 WL 86921.

6. See *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128, 133.

7. See *id.*

8. See *Kumho Tire Co., Ltd. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469, 480–481; *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332, 1339.

While the relevant evidence must satisfy a threshold reliability standard, the credibility afforded to the expert's opinion still remains for the trier of fact.[9]

First, we examine whether Scott properly qualified as an expert under the second prong of Evid.R. 702. Scott was a deputy registrar in charge of a branch of the BMV and had worked there since 1983. Through her employment at the BMV, Scott had received extensive training on how to identify fraudulent documents in yearly regional meetings and at office training sessions. These credentials qualified Scott as an expert. Next, we consider whether Scott's testimony was based on reliable scientific, technical, or other specialized information and whether her testimony was sufficiently reliable under the third prong of Evid.R. 702. Scott testified that certain characteristics help to identify whether a document is authentic. For instance, Scott testified that, to determine whether a green card was authentic, the holder's picture had to completely cover the seal. Additionally, Scott testified that, when determining whether a Social Security card was authentic, the pillars on the card had to be raised, ink dots had to appear on the card, and the edges of the card had to be perforated. Moreover, she testified that, under a "black light," the seal on the Social Security card had to glow in the dark, and the words "Social Security Administration" or "Social Security Office" had to appear on the signature line. Finally, she testified that she used reference books to determine whether documents were authentic. Based upon Scott's knowledge and experience, we hold that Scott's opinion related to specialized information and was sufficiently reliable. Accordingly, the trial court did not abuse its discretion in admitting Scott's testimony relating to the authenticity of Rangel's documents.

Conversely, we hold that Whitaker did not qualify as an expert. Even with the lenient standards set forth in the second prong of Evid.R. 702, Whitaker was not qualified to determine whether Rangel's documents were authentic, because she had only received one two-hour training session on how to identify false documents in the course of her employment with the BMV. This was not sufficient. Although the admission of her testimony relating to the authenticity of Rangel's Social Security card and green card was erroneous, we hold that the error was harmless beyond a reasonable doubt because Whitaker's testimony was similar to that of Scott, who properly qualified as an expert.[10] Accordingly, we overrule Rangel's first assignment of error.

In his second assignment of error, Rangel alleges that, after he expressed his desire to appeal, the trial court erroneously enhanced his sentence. There was no objection to the sentence at trial. Thus, Rangel has waived all but

**9.** See *State v. Nemeth, supra.*

**10.** See Crim.R. 52(A).

plain error.[11] Rangel's sentence does not rise to the level of plain error because his sentence falls within the confines of R.C. 2929.21(B)(1), which states that, for a misdemeanor of the first degree, a term of imprisonment up to six months may be imposed. Further, while the record reflects that the court did correct Rangel's sentence at the sentencing hearing, a trial court speaks only through its journal.[12] The journal here reveals that Rangel was sentenced only once to a six-month term in prison. Under these circumstances, we are unpersuaded that the trial court improperly enhanced Rangel's sentence, and we overrule his second assignment of error and affirm the judgment of the trial court.

*Judgment affirmed.*

GORMAN, P.J., concurs.

PAINTER, J., dissents.

PAINTER, Judge, dissenting.

Rangel's conviction was based on the testimony of Whitaker and Scott, who testified as to the falsity of Rangel's Social Security card and green card. Although Rangel strenuously objected to their qualifications to testify regarding the authenticity of the documents, the judge allowed the testimony.

Expert testimony is governed by Evid.R. 702. The rule outlines three requirements necessary for expert testimony to be admissible. First, the testimony must either "[relate] to matters beyond the knowledge or experience possessed by lay persons or [dispel] a misconception common among lay persons."[13] Second, the witness must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."[14] Third, the testimony must be "based on reliable scientific, technical, or other specialized information."[15] Under the third prong, the United States Supreme Court has held that trial courts must act as "gatekeepers" to ensure that expert testimony is reliable.[16] Ohio courts have adopted this thresh-

---

11. See Crim.R. 52(B).

12. *State ex rel. Worcester v. Donnellon* (1990) 49 Ohio St.3d 117, 118, 551 N.E.2d 183, 184.

13. See Evid.R. 702(A).

14. See Evid.R. 702(B).

15. See Evid.R. 702(C).

16. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469; *Kumho Tire Co., Ltd. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238.

old duty.[17] In determining a witness's reliability, "[r]elevant evidence based on valid principles will satisfy the threshold reliability standard." [18]

Here, the state argues that Evid.R. 702 does not apply because the falsity of Rangel's Social Security card and green card could have been established by lay testimony. The state claims that the court did not even qualify Whitaker and Scott as expert witnesses. While the state may be correct that the court never qualified Whitaker or Scott to testify as experts (the record is unclear), I agree with the majority that the trial court must have considered their testimony as expert opinion, because it would not have been admissible or relevant for any other purpose. And I agree with the majority that expert testimony was necessary. Lay people are not normally familiar with determining the authenticity of Social Security cards and green cards. Here, a casual inspection of the Social Security card and the green card, which were admitted into evidence, would not reveal that they were fraudulent. Though a case can be posited where expert testimony would be unnecessary—if the picture on the green card was of Mickey Mouse, or the words "Social Security" were spelled incorrectly on that card—this case required an expert to determine the validity of the cards. Thus, under the first prong of Evid.R. 702, expert testimony was required.

Neither witness satisfied either the second or the third prong of Evid.R. 702. Whitaker, as the majority concludes, did not even reach the third prong. She did not have sufficient knowledge, skill, experience, training, or education to qualify as an expert. The record reveals that the only training Whitaker received in identifying false documents was one training seminar that was under three hours long. Such minimal training did not establish sufficient expertise. I agree that the trial court abused its discretion in allowing her to testify as to the authenticity of the Social Security card and the green card.

As for Scott, she also lacked proper experience and training. She testified that, in addition to her experience working at the BMV, her training in identifying false documents consisted of yearly training meetings and "little sessions" at regional meetings. But her testimony was vague. She did not explain exactly what the training sessions taught her, or even how much time was spent on learning to identify false documents. Based on the record before us, she did not have sufficient expertise to qualify as an expert.

Further, her testimony was not reliable. Her testimony regarding the falsity of Rangel's documents consisted of general indicators that the documents were false. These indicators included that the color of Rangel's Social Security card

**17.** See *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332, 1339.

**18.** See *id.*

was darker than normal, that its print was too fine, that its edges were not perforated, and that a black-light analysis revealed that the Social Security card and the green card lacked various security features. But cross-examination revealed that Scott's knowledge came from a "reference book" that she had looked at when Rangel presented the documents. It is apparent from the record that, without the reference book, which was not admitted into evidence, Scott knew little about the documents she inspected. Also, she was unable to identify the last time that green cards were changed. And there was no testimony at all about the efficacy of the "black-light" analysis. Though a "black light" may be a proper scientific tool, there was no evidence whatever of the scientific theory or underpinnings of that technology, much less its application to these cards. Under *Daubert* and *Kumho Tire*, the trial court failed to exercise any "gate-keeping" role. Scott could not have been an expert witness, and her testimony should have been excluded.

I would reverse Rangel's conviction. Because the state produced no admissible evidence against him, the conviction is based on insufficient evidence, and Rangel is entitled to be discharged.

As to Rangel's second assignment of error, if we discharged him, the argument would be moot. But because the majority holds that the conviction is proper, we need to address the assignment, which alleges that the trial court's changing of Rangel's sentence after he stated his intention to appeal was presumptively vindictive and, therefore, violated the Due Process Clause.[19]

In *North Carolina v. Pearce*,[20] the United States Supreme Court held that due process is violated when a penalty is imposed on a defendant for successfully pursuing an appeal. The court concluded that vindictiveness cannot play a part in a sentence after a new trial, and that because "fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal * * *, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge."[21] As a prophylactic measure, the court determined that a rebuttable presumption of vindictiveness exists when a harsher sentence is imposed following retrial unless "identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding" is demonstrated so as to justify the harsher sentence.[22]

---

19. See *North Carolina v. Pearce* (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656.

20. *Id.*

21. *Id.* at 725, 89 S.Ct. at 2080, 23 L.Ed.2d at 669.

22. See *id.* at 726, 89 S.Ct. at 2081, 23 L.Ed.2d at 670.

The presumption of vindictiveness established in *Pearce* has been somewhat narrowed by later decisions of the United States Supreme Court and other courts.[23] For example, the presumption has not been applied when the facts do not warrant its application, such as when new criminal conduct by the defendant supports a greater sentence [24] or when retrial is on additional counts.[25]

Under the facts of this case, however, where the trial court increased Rangel's sentence immediately after he asserted his right to appeal, I believe that the presumption applies with more force even than in *Pearce*. As succinctly stated by a Texas appellate court, "[W]e believe that if courts are prohibited from exercising vindictiveness on a retrial because of an accused's successful appellate attack, they are likewise prohibited from exercising vindictiveness because of a convicted felon's intention to appeal." [26]

The majority contends that the imposition of a harsher sentence after Rangel expressed his desire to appeal is not plain error. I do not believe that the defendant must object to a patently illegal sentence. But the imposition of an illegal sentence is plain error—obviously the outcome of the case would have been different but for the error. The transcript reads as follows:

"THE COURT: It's the sentence of this Court that you be confined for a period of 180 days. CR, he's indigent. Suspend 150 of the days. I'm placing him on one year's probation. The terms of probation are he's to enter school to learn English; he's to follow the proper steps to obtain valid alien status and a Social Security card; he's to follow all orders of his probation officer and conditions of probation. Commit 30 days.

"MR. NAMEI: Your Honor, may we have an extension on that? He has come to court every day, and also because we would like to appeal that *Daubert* issue. The 30 days, and he could come back after Christmas.

"THE COURT: Can he post the bond?

"MR. NAMEI: Yes, your Honor.

"THE COURT: Five thousand dollars?

"MR. NAMEI: Yes, your Honor.

23. See, *e.g.*, *Alabama v. Smith* (1989), 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865; *Chaffin v. Stynchcombe* (1973), 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714; *Colten v. Kentucky* (1972), 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584.

24. See *Texas v. McCullough* (1986), 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104.

25. See *People v. Williams* (Colo.App.1996), 916 P.2d 624.

26. See *Gifford v. Texas* (Tex.App.Austin 1982), 630 S.W.2d 387, 389; see, also, *Colburn v. Texas* (Tex.Crim.App.1973), 501 S.W.2d 680.

"THE COURT: Okay, Scratch the suspend 150 days. Commit 180 days. Stay January 13th in this room, 9:00 a.m."

So, according to the record, before Rangel expressed his intention to appeal, he was to serve 30 days, but, after he asserted his intention to appeal, his sentence became 180 days. Most cases deal with greater sentences being imposed *after* an appeal.[27] Here, the trial court did not even wait that long—it imposed a greater sentence for the *intention* to appeal.[28] The record fails to provide an alternative reason for the harsher sentence. Thus, on its face, the sentence is vindictive and violates due process by penalizing Rangel for exercising his right to appeal. This court, in failing to recognize what is clear on the record, is abdicating its duty by upholding this blatantly unconstitutional sentence.

---

27. See, *e.g., State v. Aguirre* (June 14, 2000), Lorain App. No. 99CA007434, unreported, 2000 WL 763343; *State v. Staton* (July 12, 1999), Butler App. No. CA98–08–176, unreported, 1999 WL 527787; *State v. Clements* (Sept. 27, 1995), Montgomery App. No. C.A. 15155, unreported, 1995 WL 570523.

28. See *State v. Thompson* (1992), 158 Vt. 452, 613 A.2d 192. It might be that the trial court was imposing the harsher sentence to attempt to impress upon Rangel the need to return for his "stay" if the appeal were unsuccessful. Perhaps the court would have reinstated the original sentence—but we cannot speculate, we have to look to the record only. The record fails to provide a nonretaliatory justification for the increased sentence. In addition, that procedure would also be improper.