[Cite as *Parmertor v. Chardon Local Schools*, 2019-Ohio-328.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| ROBERT PARMERTOR, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DANIEL PARMERTOR, DECEASED, et al., | : | **O P I N I O N** |
| | : | |
| | : | **CASE NO: 2018-L-035** |
| Plaintiffs-Appellants, | : | |
| | : | |
| - vs - | : | |
| | : | |
| CHARDON LOCAL SCHOOLS, et al., | : | |
| | : | |
| Defendants, | : | |
| | : | |
| JOSEPH BERGANT, II, et al., | : | |
| | : | |
| Defendants-Appellees. | | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 2014 CV 000490.

Judgment: Affirmed.

*Peter William Marmaros*, Djordjevic and Marmaros, 25550 Chagrin Boulevard, Suite 202, Beachwood, OH 44122; *W. Craig Bashein*, Bashein & Bashein Co., L.P.A., Terminal Tower, 35th Floor, 50 Public Square, Cleveland, OH 44113-2216; *Paul W. Flowers* & *Louis Everett Grube*, Paul W. Flowers Co., L.P.A., Terminal Tower, Suite 1910, 50 Public Square, Cleveland, OH 44113; and *John P. O'Neil*, Elk & Elk Co. Ltd., 6105 Parkland Boulevard, Mayfield Heights, OH 44124 (For Plaintiffs-Appellants).

*Thomas E. Dover* and *Markus E. Apelis*, Gallagher Sharp LLP, Sixth Floor, Bulkley Building, 1501 Euclid Avenue, Cleveland, OH 44115 (For Defendants-Appellees).

TIMOTHY P. CANNON, J.

{¶1} Before this court is an appeal taken by plaintiffs-appellants from a February 15, 2018 judgment entry issued by the Lake County Court of Common Pleas granting summary judgment in favor of defendants-appellees. The judgment is affirmed.

{¶2} This case emanates from the tragic shooting at Chardon High School on February 27, 2012, perpetrated by Thomas M. Lane, III, which resulted in the deaths of three students: Daniel Parmertor, Russell King, Jr., and Demetrius Hewlin. Another student, Nick Walczak, was paralyzed, and two other students were injured.

{¶3} The circumstances of the shooting are generally undisputed. Lane was a student at Lake Academy, an alternative school for students with academic or behavioral issues. Lane's bus ride to Lake Academy required him to change buses at Chardon High School. On February 27, 2012, Lane took a gun and ammunition, hidden in his backpack, on his bus ride to school. He got off the bus at Chardon High School and waited in the school cafeteria for his transfer bus to Lake Academy. Other students were congregated in the cafeteria. When the bell rang and students began to disperse, Lane reached into his backpack and fired the concealed handgun, striking and killing Russell King, Jr. Lane then removed the gun from the backpack and continued firing, striking and killing Daniel Parmertor and Demetrius Hewlin and injuring two others. Frank Hall, the high school football coach on cafeteria duty, confronted Lane and chased him down the hall from the cafeteria. Lane shot Nick Walczak in the back as he ran down the hallway, seriously injuring him, and then Lane ran out of the school. Surveillance video establishes 6 seconds elapsed between the first shot that was fired while the gun was still in the backpack and the last shot that was fired in the cafeteria. Approximately 22 seconds elapsed between the first shot and Lane's exit from the building.

{¶4} A complaint was filed in the Lake County Court of Common Pleas on February 27, 2014. The plaintiffs in the case are Robert and Dina Parmertor, each individually and as administrators of the estate of Daniel Parmertor, deceased; Jeffrey T. Orndorff, administrator of the estate of Demetrius Hewlin, deceased; Phyllis Ferguson; Jeannie King, individually and as administratrix of the estate of Russell King, Jr.,

2

deceased; Russell King; and Nick Walczak. The Parmertor, Hewlin, and King Plaintiffs asserted claims against all defendants for wrongful death: negligence and recklessness; wrongful death: conscious disregard, malice, willful and wanton misconduct; survivorship; and loss of consortium[1]. Plaintiff Walczak asserted claims of negligence and recklessness; and conscious disregard, malice, and willful and wanton misconduct.

{¶5} The named defendants in the complaint are Chardon Local Schools, Chardon Local School District, and Chardon High School (collectively, "Chardon Schools"); Joseph Bergant, II, Dana Stearns, Andy Fetchik, Drew Trimble, and Michael J. Sedlack (collectively, "Chardon School Employees"); Chardon Board of Education and Chardon Local Schools Board of Education (collectively, "Chardon School Board"); Debbie Seenarine-Wilson, Blake Rear, Cindy Sague, Karen Blankenship, David Fairbanks, Paul Stefanko, Guy Wilson, and Larry Reiter (collectively, "Chardon School Board Members"); The Lake Academy Alternative School, The Lake Academy Alternative School-Lake County Educational Service Center, Lake Academy, and Lake County Educational Service Center (collectively, "Lake Academy"); and Bill Kermavner, John Weiss, and Brian Bontempo (collectively, "Lake Educational Service Center Employees").

{¶6} On November 25, 2014, the trial court dismissed Plaintiffs' claims against Chardon Schools, Chardon School Board, Chardon School Board Members, and Lake Academy based upon statutory immunity pursuant to R.C. Chapter 2744. The trial court also granted judgment on the pleadings in favor of the Chardon School Employees on Plaintiffs' claims for negligence, pursuant to R.C. 2744.03(A)(6).[2] Plaintiffs' claims

---

1. Plaintiff Russell King's claims for loss of consortium were voluntarily dismissed, pursuant to Civ.R. 41(A), as he is deceased.

2. These decisions were affirmed on appeal in *Parmertor v. Chardon Local Schools*, 11th Dist. Lake Nos. 2014-L-129 & 2014-L-133, 2016-Ohio-761.

against the Lake Educational Service Center Employees were also dismissed, pursuant to a Civ.R. 41(A) notice of dismissal, on August 10, 2017.

{¶7} The Chardon School Employees subsequently moved for summary judgment on Plaintiffs' remaining claims, on the basis that there is legally insufficient evidence of specific conduct that rises to the level of malice, bad faith, wanton, or reckless so as to overcome the statutory immunity to which they are entitled. They argued the deposition testimony reflects the School Employees considered the safety and security of students and staff as their top priority. The school administrators worked with local law enforcement to provide safety training to students and staff, and each school conducted state-mandated emergency drills, including an active shooter drill at Chardon High School in 2009, with the involvement of local police and fire departments. The school had a safety and security plan in place, which was evaluated by law enforcement for possible improvements; law enforcement was never critical of the protocols in place, including not having a school resource officer ("SRO") stationed at the school. Police officers were in the building on a daily basis, either responding to calls or meeting with students and staff; the Chardon Police Department also required an officer to walk through the high school twice a day when school was in session. Lieutenant Troy Duncan, the police department's liaison to the school district, was at the high school at least once per week.

{¶8} The School Employees also engaged in efforts to increase security and safety by having staff and administrators act as a visible presence throughout the school day, but particularly in the mornings when the students arrived at school. Staff monitored the cafeteria, where large numbers of students would congregate before classes began. The administrators also provided guidance counselors, worked to become acquainted with individual students, and regularly attended school safety and security conferences.

4

{¶9} The Chardon School Employees also argued that summary judgment in their favor was appropriate because, even without statutory immunity, they owed no legal duty to Plaintiffs or their decedents to protect against Lane's unforeseeable criminal acts. They contended Ohio law does not recognize a "special relationship" between school officials and students that creates a duty to prevent criminal acts of third parties. Further, they claimed not to have a legal duty because Lane's actions were not foreseeable: there was no history of violent crime at Chardon High School; the School Employees had no knowledge Lane intended to bring a gun to school or intended to kill other students; they had no knowledge of any behavioral issues or violent propensities; Lane attended Lake Academy at the request of his guardians, not due to academic or behavioral issues; he had no disciplinary issues; and Lane was on track to graduate early despite attendance issues.

{¶10} Finally, the Chardon School Employees argued summary judgment in their favor was appropriate because Lane's actions were the sole proximate cause of Plaintiffs' injuries and damages. They argued that Plaintiffs' claim that the Chardon School Employees failed to employ an SRO, and that this measure would have prevented the shooting, is legally insufficient to hold them liable. First, the decision to hire an SRO is within the exclusive province of the Board of Education, not the School Employees. Second, Plaintiffs did not present legally sufficient evidence that an SRO would have prevented the shooting, which was over in approximately 22 seconds, or that it would have deterred Lane from bringing a gun to the school.

{¶11} Plaintiffs duly opposed the motion, contending triable issues of fact were established upon the claim that the lives and safety of the Chardon High School students had been recklessly endangered. Plaintiffs asserted the School Employees' motion for summary judgment ignored deposition testimony that established critical security

5

recommendations that would have either prevented or deterred Lane's criminal actions were "rashly rejected." They contended Chardon High School was not nearly as safe as suggested by the School Employees and that local police were called to the school 500-600 times per year, "typically in response to reports of fighting, threats to faculty and staff, drugs, thefts, and vandalism."

{¶12} Plaintiffs concluded that if an SRO had been present at the high school, it is doubtful the shooting would have occurred. Superintendent Bergant, Principal Fetcik, and Assistant Principal Trimble all agreed that Lane should have been removed from the cafeteria when he arrived at the school wearing a sweatshirt on which was printed the word "KILLER." Video surveillance shows that Lane was never confronted in the 30 minutes before he began shooting in the cafeteria. Plaintiffs contend the cafeteria would have been the most likely location an SRO would have been stationed. This argument was based on the report of Gregory M. Baeppler, a security consultant hired by Plaintiffs as an expert witness. Baeppler also concluded it was likely Lane would have been deterred from bringing a gun, knowing an armed SRO was present at the school. Plaintiffs further bolster their argument with the fact that an SRO was hired following the shooting and that Bergant has acknowledged criminal activity at the school has diminished.

{¶13} Plaintiffs alleged the Chardon School Employees prevented the hiring of an SRO. A Safety and Security Action Team ("SSAT") was formed in 2006, which included Police Chief Timothy McKenna and Lieutenant Troy Duncan, with Assistant Principal Trimble as the Chairperson. The SSAT was tasked with creating a proposal to address security issues and presenting it to the Chardon School Board. Plaintiffs alleged the original proposal included a recommendation for a full-time SRO, which had been endorsed by Lt. Duncan, but that Trimble unilaterally crossed it off and handwrote "supervision" before it was presented to the School Board in April 2007. Plaintiffs also

6

contended that by September 2008 it was foreseeable a gunman could enter Chardon High School. This argument was based on a letter sent from Superintendent Bergant to school parents and staff that addressed an incident involving a student with a handgun at a nearby high school. Bergant had discussed the option of an SRO with Chief McKenna and Lt. Duncan but did not address the issue with the School Board.

{¶14} Plaintiffs further argued that schools do have a legal duty to keep their students safe and that school shootings are foreseeable, based on the recent increase in such incidents. They argued the risk was known to the Chardon School Employees, as evidenced by the active shooter drill performed in 2009. But, they argued, the Chardon School Employees were indifferent to critical preventative measures.

{¶15} In their reply, the Chardon School Employees responded that, "whatever the plaintiffs' criticisms of Chardon High School and its administrators, * * * the absence of a [SRO] at the high school does not rise to the level of malicious, reckless or wanton misconduct or bad faith on the part of individual school administrators. Consideration and action upon this issue ultimately rested with the Board of Education, not the individual administrators. In light of the existing presence of and relationship with law enforcement at Chardon High School, the absence of a [SRO] cannot reasonably be said to be misconduct so perverse as to discard statutory immunity." They further argued that the opinion of Plaintiffs' expert witness that an SRO would have prevented the shooting was merely speculative and pure conjecture.

{¶16} On February 15, 2018, the trial court granted the motion and entered summary judgment in favor of the Chardon School Employees. The trial court concluded there was no evidence of bad faith or of malicious, wanton, or reckless behavior on the part of the Chardon School Employees, nor was there any evidence they knew or should have known Lane posed a danger to other students.

7

{¶17} The trial court also noted that Plaintiffs had significantly misstated the history of police interaction with Chardon High School. Based on Chief McKenna's deposition testimony, the 500 to 600 calls to which Chardon Police responded each year included visits to all schools in the Chardon School District and the twice-a-day routine walk-throughs at the middle and high schools. The number one reason for calls requiring a police response were faulty alarm signals, not violence.

{¶18} This matter is now before us on the notice of appeal filed by Plaintiffs, who raise the following two assignments of error:

> [1.] The trial judge abused his discretion by finding that the report that had been prepared by Plaintiff-Appellants' security specialist was too 'speculative' to be submitted to the jury.
>
> [2.] The trial judge erred, as a matter of law, by granting summary judgment upon Plaintiff-Appellants' claims for reckless and wanton liability under R.C. 2744.03(A)(6)(b).

The Chardon School Employees responded and raise one cross assignment of error:

> As an alternative basis for summary judgment, the Chardon School Employees were also entitled to summary judgment because [Lane] was the sole proximate cause of the Appellants' injuries.

{¶19} "'Summary judgment is a procedural device to terminate litigation and to avoid a formal trial when there is nothing to try. It must be awarded with caution[.]'" *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358 (1992), quoting *Norris v. Standard Oil Co.*, 70 Ohio St.2d 1, 2 (1982). An appellate court reviews a trial court's decision to grant summary judgment under a de novo standard of review, i.e., "independently and without deference to the trial court's determination." *Brown v. Cty. Commrs. of Scioto Cty.*, 87 Ohio App.3d 704, 711 (4th Dist.1993) (citation omitted); *see also Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

{¶20} "Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that

8

> (1) [n]o genuine issue as to any material fact remains to be litigated;
> (2) the moving party is entitled to judgment as a matter of law; and
> (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977); *see also Murphy*, *supra*, at 359 ("Doubts must be resolved in favor of the non-moving party.").

**{¶21}** The rule further provides that "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Civ.R. 56(C).

**{¶22}** "[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims."  *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied."  *Id.*

**{¶23}** If this initial burden is met, the nonmoving party then bears the reciprocal burden to set forth specific facts demonstrating there is a genuine issue for trial.  *Id.* at 293, citing Civ.R. 56(E).  If the nonmovant fails to do so, summary judgment will be entered against the nonmoving party.  *Id.*

### Assignment of Error I

**{¶24}** As stated above, Plaintiffs submitted the expert report of Gregory M. Baeppler, a security consultant, in support of their allegations.  In the report, Baeppler made the following findings and opinions:

9

- The Chardon Schools Administrators had a responsibility to protect the children attending the Chardon Schools. It was their responsibility to promulgate and implement security measures and policies to provide a safe and secure environment.

- The Chardon Administrators had a responsibility to provide a safe and secure environment including taking measures to deter and prevent intruders or active shooters.

- The security measures put in place by the Defendant Administrators at the time of the shooting were grossly insufficient to protect students and staff. Proper security measures should have included an SRO, restricted access and entrance monitoring would have likely prevented the tragedy of February 27th 2012.

- The Safety and Security Action Team, including Chardon Police Department Chief McKenna and Lieutenant Duncan, specifically recommended that an SRO was needed in Chardon High School in 2007.

- Superintendent Bergant concluded on his own in early 2011 that an SRO was needed in Chardon High School, but took no action to have the SRO put into place. This egregious and inexcusable failure included not going to the board for approval or discussing the need for an SRO with other administrators. Bergant's conduct was reckless and wanton in failing to take action on his conclusion that an SRO was needed prior to the 2011-2012 school year at the High School.

- Prior to the February 27th 2012 shooting, there was an overwhelming amount of criminal activity occurring at Chardon High School, including fights, assaults and drug activity. By the estimate of the Police Chief, Chardon Police Department was called to the Chardon schools 500 – 600 times per year.

- The Defendant Administrators deliberately disregarded the recommendations of their own local law enforcement in failing to arrange, provide and employ an SRO in Chardon High School prior to the shooting. This conduct by the Defendant Administrators is reckless and wanton, and placed the safety of Chardon High School students and staff at risk.

- The actions of the Defendant Administrators in failing to employ and utilize an SRO in violation of the SSAT recommendations and local law enforcement recommendations were reckless and wanton.

- This shooting incident was foreseeable. That the Chardon schools recommended practicing a scenario involving an active shooter

situation in 2009 speaks directly to their awareness of the issue. Superintendent Bergant also admitted this was a well-recognized threat the school faced.

- Interestingly, a school math teacher, Thomas Ricci, thought an active shooter in the High School was foreseeable enough to have TWO ballistic vests available in his classroom.

- Vice Principal Trimble, without any authorization and in direct contradiction of the SSAT's report and recommendations, crossed off the recommendation of an SRO on the SSAT strategic planning report. As a result, the determined and recommended need for an SRO was not presented to the board as planned and anticipated. This conduct is reckless and wanton, and placed students and staff at risk.

- The tragic murders of Russell King, Jr., Demetrius Hewlin, and Daniel Parmertor and the senseless crippling of Nick Walczak, by gunshot occurred as a direct and proximate result of the egregious conduct and actions of the Defendant Administrators documented in the materials I reviewed and outlined in my report.

**{¶25}** Baeppler ultimately concluded in his report that (1) "an SRO would have deterred and prevented the incident from occurring in the first place"; and (2) the failure of the Defendant Administrators to employ an SRO was reckless and wanton, placed students and staff at risk, and "directly led to this tragedy, including the deaths * * * and catastrophic injuries" of the students.

**{¶26}** The trial court found the expert report is inadmissible because it is speculative and renders a conclusion within the province of the finder of fact. Plaintiffs argue under their first assignment of error that this was reversible error.

**{¶27}** Generally, "[t]rial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶16; citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). "'Abuse of discretion' suggests unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this court

11

to substitute its judgment for that of the trial court." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶9 (citation omitted). In a summary judgment exercise, however, "the decision to admit evidence is purely a legal one as it involves solely a question of law, thus necessarily the standard of review is de novo." *Rilley v. Brimfield Twp.*, 11th Dist. Portage No. 2009-P-0036, 2010-Ohio-5181, ¶56. "'Ohio's standards regarding the admissibility of expert opinions are relatively lenient as to a determination of who is an expert but relatively strict in governing the admissibility of the expert testimony.'" *Id.* at ¶59, quoting *Douglass v. Salem Community Hosp.*, 153 Ohio App.3d 350, 2003-Ohio-4006, ¶31 (7th Dist.), citing *State v. Rangel*, 140 Ohio App.3d 291, 295 (1st Dist.2000).

**{¶28}** Plaintiffs assert the trial court misapprehends the governing standards, in that Evid.R. 704 permits opinion testimony on the ultimate issue to be decided by a jury.

**{¶29}** Evid.R. 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." As explained in the Staff Notes to Evid.R. 704, however, "[t]he rule does not serve to make opinion evidence on an ultimate issue admissible; it merely provides that opinion evidence on an ultimate issue is not excludable *per se*. The rule must be read in conjunction with Rule 701 [opinion testimony by witnesses] and Rule 702 [testimony by experts.]"

**{¶30}** Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

12

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

**{¶31}** Accordingly, "'[e]xpert opinion testimony is admissible as to an ultimate fact without infringing [upon] the function of the jury, if the determination of such ultimate fact requires the application of expert knowledge not within the common knowledge of the jury.'" *State Auto. Mut. Ins. Co. v. Chrysler Corp.*, 36 Ohio St.2d 151, 162 (1973), quoting *McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77 (1967), paragraph three of the syllabus.

**{¶32}** Here, the trial court held that "the question of whether the School Employees acted with malicious purpose, in bad faith, or in a wanton or reckless manner is the ultimate question for the finder of fact and not of such highly technical nature to be beyond the comprehension of the average juror. Furthermore, Baeppler's conclusion that an SRO would have deterred and prevented the incident, which was completed in 22 seconds, is completely speculative. Because a fact-finder is capable of reaching conclusions on these issues without an expert-witness opinion, Baeppler's testimony would be inadmissible at trial, and therefore cannot be relied upon in a summary judgment action."

**{¶33}** We do not conclude that the trial court demonstrated a misapprehension of the law in this regard. We also do not conclude that the trial court erred in its application of the law in ruling the expert report inadmissible.

**{¶34}** The conclusions in Baeppler's report relating to proximate cause, deterrence, and prevention are purely speculative and therefore legally insufficient to demonstrate a genuine issue of material fact. They were not based on reliable scientific, technical, or other specialized information, and Baeppler did not identify any standard of care or standard security practices in the industry upon which he based his opinion. *See, e.g.*, *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 772 (9th Dist.1995) (expert opinion

13

that a vocational school teacher acted recklessly by failing to provide adequate protection from an accident was conclusory and therefore did not create a genuine issue of material fact); *Fediaczko v. Mahoning Cty. Children Servs.*, 7th Dist. Mahoning No. 11 MA 186, 2012-Ohio-6090, ¶31 ("just because a plaintiff can find an expert to state in an affidavit that an act was reckless does not mean that there is a genuine issue for trial as to whether the defendant lost her immunity due to recklessness"); *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 2002-Ohio-222, ¶41 (9th Dist.) (emphasis sic) ("Appellant fails to appreciate that this testimony does not create any issues of *fact,* but merely states appellant's position with respect to appellees' culpability, which is a legal conclusion.").

{¶35} There are many speculative aspects of the report, e.g., where the SRO would have been stationed at the time of the shooting; whether the SRO would have seen Lane and what was printed on his sweatshirt; and whether an SRO could have done anything during the 6 seconds of shooting in the cafeteria. Additionally, Baeppler's expert report opines on legal duties and obligations of the Chardon School Employees. Nothing in Baeppler's curriculum vitea establishes how he is qualified to draw these conclusions regarding the School Employees' standard of care.

{¶36} Further, the ultimate question of whether the Chardon School Employees' conduct was malicious, wanton, reckless, or in bad faith does not require the application of expert knowledge. The average juror would be capable of evaluating the same evidence available to Baeppler in determining this issue. Therefore, although Baeppler's report was not objectionable merely because it reaches the ultimate issue, it was objectionable because it neither relates to matters beyond the knowledge or experience of lay persons nor serves to dispel a misconception common among lay persons. *See, e.g.*, *Donlin v. Rural Metro Ambulance, Inc.*, 11th Dist. Trumbull No. 2002-T-0148, 2004-

14

Ohio-1704, ¶26 (a fact-finder is capable of determining whether a first responder's alleged failure to follow protocol was willful and wanton misconduct).

{¶37} Plaintiffs' first assignment of error is without merit.

### Assignment of Error II

{¶38} Under their second assignment of error, Plaintiffs argue the trial court erred in granting summary judgment in favor of the Chardon School Employees. Specifically, they assert the evidence demonstrates genuine issues of material fact exist as to the School Employees' indifference to enacting critical *preventative* measures, specifically the failure to employ an SRO at Chardon High School. The School Employees respond that they are immune from liability because there is no evidence that any decision not to employ an SRO or other preventative measures amounts to bad faith or malicious, wanton, or reckless behavior.

{¶39} Subject to three exceptions, employees of political subdivisions, which includes school districts, are immune from liability in a civil action brought "to recover damages for injury, death, or loss to person or property allegedly caused by an act or omission in connection with a governmental or proprietary function." R.C. 2744.03(A); *see also Vidovic v. Hoynes*, 11th Dist. Lake No. 2014-L-054, 2015-Ohio-712, ¶48, citing *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶47. The exception to immunity relevant in this case is when "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" R.C. 2744.03(A)(6)(b).

{¶40} "Malice" is characterized by "hatred, ill will or a spirit of revenge," or "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty,* 32 Ohio St.3d 334, 336 (1987). "Bad faith" connotes a "dishonest purpose" or "conscious wrongdoing." *Canfora v. Coiro*, 11th

15

Dist. Lake No. 2006-L-105, 2007-Ohio-2314, ¶72. "Wanton" misconduct is the failure to exercise any care whatsoever towards those to whom a duty of care is owed under circumstances where there is a great probability that harm will occur. *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-118 (1977). "Reckless" conduct includes actions where one possesses a "perverse disregard of a known risk" and where the actor is conscious that his conduct will in all probability result in injury. *O'Toole*, *supra*, at ¶73-74; *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph four of the syllabus (reckless conduct is "substantially greater than negligent conduct").

**{¶41}** These mental states have been summarized as "a willful and intentional design to do injury without just cause or excuse (88 Ohio Jurisprudence 3d, Torts Section 1) or a failure to exercise any care when the probability of harm is great, and that probability of harm is known to the actor (70 Ohio Jurisprudence 3d, Negligence Section 34)." *Smith v. McCarty*, 9th Dist. Summit No. 15670, 1993 WL 6280, *2 (Jan. 13, 1993); *see also Vidovic*, *supra*, at ¶52, quoting *Piispanen v. Carter*, 11th Dist. Lake No. 2005-L-133, 2006-Ohio-2382, ¶28.

**{¶42}** "While a political subdivision employee's entitlement to immunity is ordinarily a question of law, whether there exists malice, bad faith, and wanton or reckless behavior are generally questions of fact to be resolved by the jury. 'Summary judgment is appropriate only when the facts are clear and fail to rise to the level of conduct that could be construed as malicious, in bad faith, or wanton and reckless.'" *Spitulski v. Bd. of Educ. of Toledo City School Dist.*, 6th Dist. Lucas No. L-16-1225, 2017-Ohio-2692, ¶23, quoting *Long v. Hanging Rock*, 4th Dist. Lawrence No. 09CA30, 2011-Ohio-5137, ¶18. *See also O'Toole*, *supra*, at ¶75, and *Vidovic*, *supra*, at ¶53.

16

{¶43} Upon our thorough and independent review of the record, we conclude that the record completely supports the trial court's decision. The relevant portion of the trial court's decision reads as follows:

### Trial Court's Decision

{¶44} *Upon review, the court finds the School Employees' Motion for Summary Judgment well taken. As an initial matter, Plaintiffs' significantly misstate the history of police interaction with Chardon High School. The 500 to 600 police "calls" Chardon Police Department responded to were not, as Plaintiffs allege, "typically in response to reports of fighting, threats to faculty and staff, drugs, and vandalism," nor were the police visits strictly to Chardon High School. According to former Chardon Police Chief Timothy McKenna's ("Chief McKenna") deposition testimony, the 500 to 600 calls included visits to all schools in the Chardon School District. Mckenna Depo. p. 67. He stated that "[e]very time an officer stopped to do a walk-through as required morning and afternoon, both middle and the high school created a call." Id. As for calls requiring a police response, Chief McKenna stated that faulty alarm signals "would probably be your number one response." Id. at p. 70. Although Chief McKenna acknowledged that verbal and physical fights, vandalism and drug issues occurred at Chardon High School, he gave no indication that such situations were a common or pervasive problem. Id. at pp. 70-72. Additionally, he was aware of only one incident in which a student had brought a firearm to a football game, and he had no knowledge of any student ever bringing a knife or gun into Chardon High School. Id.*

{¶45} *The Chardon School District formed the Safety and Security Team in the 2006/2007 school year as part of its Strategic Safety Plan, to explore all aspects of safety and security throughout the Chardon Schools and determine where deficiencies might exist. The group's mission was to meet and create a Safety Proposal to present to the*

17

*Chardon School Board before the 2007/2008 school year. Although the group included several individuals at the outset, members gradually dropped out, leaving as the final team members, High School Principal Doug DeLong ("DeLong") [DeLong left the Chardon School District at the end of the 2007/2008 school year.], Lt. Duncun, community member and parent Tim Georgen ("Georgen"), and Assistant Principal Drew Trimble ("Trimble"), who was the committee chair.*

<u>*ASSISTANT PRINCIPAL DREW TRIMBLE*</u>

*{¶46} Plaintiffs claim that Trimble exhibited willful and wanton misconduct by making the unilateral decision to remove the SRO recommendation from the Safety Plan. Trimble stated that as committee Chair, she facilitated the meetings and typed the finalized Safety Proposal with input from the committee. Trimble Depo., pp. 15-16. Her function was not to "approve" the plan but to submit the plan based upon the findings of the group as a whole. Id. at p. 31. The committee's task was to evaluate security issues for the entire district, not just the high school, and the group met approximately ten times. Id. at pp. 24, 52. Trimble recalled that, with input from law enforcement, the committee determined safety and security issues in Chardon were being "handled" and although an SRO would have been a nice addition, it was not deemed "necessary." Id. at p. 22. The term "SRO" was crossed off the final plan and replaced by "Supervision" after the group decided a full-time SRO was not needed, and student/security issues would be addressed by in-building administration and/or the Chardon Police Department or Geauga Sheriff's Department if necessary. Id. at p. 142. Trimble gave the completed Safety Proposal to Superintendent Joseph Bergant, II ("Bergant") before it went to the Chardon School Board but she had no involvement in the creation or promulgation of the Safety Plan which was subsequently enacted. Id. at pp. 131, 141. She recalled no further conversations*

18

*concerning SROs after the Safety Proposal was presented to the Chardon School Board in the fall of 2007. Id. at p. 77.*

**{¶47}** *Parent and citizen committee member Georgen stated that the recommendations were not up to individual members but the entire committee. Georgen Depo., p. 45. The SRO discussions considered whether it would be reasonable to have an SRO at Chardon High School, given that Chardon is a city with a population of only 5,000. Id. at pp. 18, 21. Georgen did not recall reaching definitive conclusions about SROs and considered the discussions to be "a recommendation to research it further." Id. at p. 18. Lt. Duncan recalled recommending an SRO as part of the Security Plan, but acknowledged that it was one of "the 15 or 18 things" they discussed to improve security. Duncan Depo., pp. 62, 67. He did not recall being present when the SRO recommendation was changed to "Supervision," nor did he know who was responsible for making the change. Id. at pp. 65, 67. Nonetheless, he considered the security apparatus in place at Chardon High School to be adequate and appropriate, and stated that he would not have sent his daughter to the school if he did not think it was safe. Id. at pp. 94-95. Georgen also believed the school district had taken reasonable measures to ensure the safety and security of his children. Georgen Depo., p. 46.*

**{¶48}** *The court finds there is no evidence of malice, bad faith, and wanton or reckless behavior on the part of Trimble. Trimble denied having any particular decision-making authority beyond that of the other group members, and both Lt. Duncan and Georgen indicated that decisions were made by group consensus. The evidence indicates that the [SSAT] meetings were "brainstorming" sessions to consider options for increasing safety and security throughout the district, while also considering the costs involved. No evidence exists that the ultimate conclusions were anything other than a group recommendation to forward to the Chardon School Board, who would then decide*

*which, if any measures, to implement. Assuming, arguendo, that Trimble unilaterally changed the SRO recommendation to "Supervision," there is no evidence that she did so with "'a willful and intentional design to do injury without just cause or excuse * * * or a failure to exercise any care when the probability of harm is great, and that probability of harm was known'" to her. [Vidovic quoting Piispanen, supra.] As such, Trimble is entitled to judgment as a matter of law on the immunity issue.*

<u>*SUPERINTENDENT JOSEPH BERGANT, II*</u>

**{¶49}** *Bergant was Superintendent of the Chardon Local Schools from 2005 to 2013. Bergant Depo., p. 7. He acknowledged that from an employment standpoint, he was the "point person" for security issues at Chardon High School, but Trimble was knowledgeable about security as well. Id. at p. 10. Bergant recalled having one casual conversation with Chief McKenna in approximately August 2011 in which Chief McKenna recommended that the school district investigate obtaining an SRO for Chardon High School. Id. at pp. 11-13. Bergant believed the school district lacked the money to pay for an SRO but Chief McKenna advised him that grants to pay for the SRO were available from the U.S. Department of Education. Id. at p. 17. He acknowledged that prior to 2011 there were no funds budgeted for an SRO because he "didn't want one." Id. at p. [19]. After the discussion with McKenna, Bergant decided that an SRO was needed but he did not tell Trimble, the Chardon Board Members or anyone else. Id. at pp. 60-62. Prior to the shooting, Bergant never requested from the School Board any funds for an SRO. Id. at p. 86.*

**{¶50}** *In 2008, Bergant sent a letter to parents and staff in the district advising them that a student had entered Willoughby South High School with a gun and had been apprehended by police. Id. at p. 116. Bergant agreed that it was foreseeable after the Willoughby South incident, that a person could enter Chardon High School with a gun.*

20

*Id. at p. 118. In response, the Chardon Schools increased the number of security cameras, and school officials made a visit to the Orange School District to observe a crisis drill. Id. at p. 123. With the cooperation of local law enforcement, an active shooter drill was conducted at Chardon High School in 2009. Id. at p. 130. Bergant agreed there was nothing proactive in the district's Strategic Safety Plan to deter a shooting from occurring, and that the safety measures they had undertaken were reactive measures, intended to respond after a shooter had entered the building. Id. at pp. 129-130.*

**{¶51}** *Plaintiffs contend that Bergant is liable because he did not pursue more proactive measures including budgeting for an SRO, even after a student with a gun had entered Willoughby South High School and Bergant realized that such a situation could occur at Chardon High School. The court finds that Bergant's actions cannot be characterized as conduct beyond negligence, for which Bergant is entitled to immunity. R.C. 2744.03(A)(6). There is no evidence that Bergant acted in bad faith, i.e., with a dishonest purpose, moral obliquity, conscious wrongdoing, [or] breach of a known duty through some ulterior motive or ill will. Shadoan v. Summit Cty. Children Serv. Bd., 9th Dist. Summit No. 21486, 2003-Ohio-5775. Nor is there evidence that he acted wantonly, i.e., by failing to exercise any care toward those to whom a great duty of care is owed under the circumstances in which there is great probability that harm will result; or recklessly, i.e., with conscious disregard of or indifference to a known or obvious risk or harm to another that is unreasonable under the circumstances. Chavalia v. Cleveland, 8th Dist. Cuyahoga Nos. 104608 & 104621, 2017-Ohio-1048. Accordingly, the court finds that Bergant is entitled to judgment as a matter of law.*

*OPERATIONS MANAGER DANA STEARNS*

**{¶52}** *In 2012, Dana Stearns ("Stearns") was the Manager of Operations for the Chardon Board of Education. Stearns Depo., p. 7. Stearns stated that his employment*

21

*responsibilities included overseeing all non-teaching personnel throughout the school district. Id. In addition, at the direction of the Superintendent, he researched options for certain security measures, such as surveillance cameras on school buses, and controlled access systems for entry into all school buildings. Id. at pp. 18-19. Based upon his research and the proposals he received, Stearns made a recommendation to the Superintendent, who in turn, made a recommendation to the Chardon School Board. Id. at pp. 23-24. The Chardon School Board had the ultimate authority for approval of any safety or security expenditure. Id. Stearns had only implementation and design authority for safety equipment, after the decision to purchase the equipment had been approved by the Chardon School Board. Id. at p. 11. He had no authority regarding the decision to hire an SRO and never discussed with anyone the possibility of having an SRO in the high school. Id. at p. 12.*

*{¶53} Plaintiffs have made no specific allegations against Stearns and provide no evidence that he had any decision-making authority for hiring an SRO. As such, he is entitled to immunity as there is no evidence that he engaged in conduct as set forth in R.C. 2744.03(A)(6)(b).*

<u>ASSISTANT PRINCIPAL MICHAEL J. SEDLAK</u>

*{¶54} Michael Sedlak ("Sedlak") was an Assistant Principal at Chardon High School from the fall of 2010 through the end of the 2012/2013 school year. Sedlak Depo. p. 6. The Safety Proposal and the implementation of the Strategic Safety Plan had been completed prior to his hiring. Id. at p. 9. He was not involved in any discussions concerning staffing for security prior to the shooting in 2012, nor did he have any discussions with school officials or local law enforcement about the use of an SRO at Chardon High School. Id. at pp. 8, 11. Sedlak did not recall having conversations with Superintendent Bergant or Principal Andrew Fetchik ("Fetchik") about budget issues for*

*security, but he believed he could raise such issues for discussion with Fetchik if he thought a particular security measure was needed. Id. at p. 18. He acknowledged that the purpose of hiring an SRO after the shooting was to keep students and staff safe. Id. at p. 38.*

**{¶55}** *The court finds that Sedlak is entitled to immunity as Plaintiffs raise no specific allegations against Sedlak and present no evidence that he engaged in acts of bad faith, maliciousness, recklessness, or wanton conduct.*

<u>PRINCIPAL ANDREW FETCHIK</u>

**{¶56}** *Fetchik was the Chardon High School Principal from the 2008/2009 school year through the 2015/2016 school year. Fetchik Depo. p. 5. The Strategic Safety Plan was already in place when he was hired. Id. at p. 10. Prior to 2012, annual meetings were conducted in which Fetchik, Sedlak, Trimble, Bergant, Stearns, Lt. Duncan, and Chief McKenna would evaluate security based upon the Strategic Safety Plan or Board policy. Id. at 17. Fetchik recalled general discussions about safety but he had no recollection of ever recommending an SRO to the group. Id. at p. 15. He would have made the recommendation for an SRO if he felt that one was needed. Id. at p. 20. Fetchik did not recall having specific discussions about SROs with either Lt. Duncan or Chief McKenna, and he never requested funds for an SRO in his annual budget request. Id. at pp. 22, 32.*

**{¶57}** *The court finds no specific allegations have been made against Fetchik and there is no evidence that Fetchik acted with bad faith, malice or in a wanton and reckless manner. Accordingly, he is entitled to immunity on Plaintiffs' claims.*

## Conclusion

**{¶58}** We find no way to improve upon the trial court's well-written entry as it pertains to the individual Chardon School Employees. Therefore, we adopt the quoted portion of the trial court's decision as our own.

**{¶59}** In their reply brief on appeal, Plaintiffs contend the Chardon School Employees have "refused to address damaging evidence" in the record. Specifically, they assert that no meaningful supervision was being furnished in the cafeteria because (1) the School Employees conceded that Lane's sweatshirt, on which was printed the word "KILLER," should have been a warning and a red flag that Lane should have been immediately removed from the cafeteria, and (2) Fetchik was only able to identify a single teacher, a study hall monitor, who monitored approximately 150 students in the cafeteria in the mornings. Additionally, Plaintiffs assert that the School Employees' defense of Lane's character is not credible because of his frequent absences caused by alleged migraines that were never verified. None of these contentions creates a genuine issue of material fact as to whether the School Employees acted in bad faith or engaged in other conduct that obviates their statutory immunity. These contentions merely highlight the instability and hindsight nature of Plaintiffs' claim. Absent is reference to any definitive breach of an established duty.

**{¶60}** Appellants additionally filed a notice of supplemental authority, which offers, in support of their arguments on appeal, the opinions in *Estate of Olsen v. Fairfield City School Dist. Bd. of Edn.*, S.D.Ohio No. 1:15cv787, 2018 WL 4539440 (Sept. 21, 2018) and *Meyers v. Cincinnati Bd. of Edn.*, S.D.Ohio No. 1:17-cv-521, 2018 WL 4566271 (Sept. 24, 2018). Both cases arose after two young students committed suicide, allegedly as a result of ongoing bullying at the students' schools. Appellants specifically direct our

24

attention to the following passage from a Sixth Circuit opinion, applying Tennessee law, which is quoted in both district opinions:

> Our newspapers and television networks consistently report instances when young people harm themselves or others after being bullied by their peers. Such occurrences may not be common within an individual school, but because reports of these tragedies are consistent and well-publicized, all school districts should realize that self-harm is a reasonably foreseeable result of bullying, without requiring specific evidence of the victim's mental state. If a school is *aware* of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of the bullying might resort to self-harm, even suicide.

*Tumminello v. Father Ryan High Sch., Inc.*, 678 Fed.Appx. 281, 288 (6th Cir.2017) (emphasis sic); *see Olsen*, *supra*, at *13; *Meyers*, *supra*, at *11. We conclude that the opinions in *Olsen* and *Meyers*, as well as *Tumminello*, involve legal issues inapposite to those at issue in the case sub judice. Further, they do not support appellants' position on appeal; there is no evidence in the record whatsoever that any of the School Employees were aware of but consciously disregarded Lane's propensity for violence or his intention to carry out an attack on the school. In fact, there is no evidence Lane had any propensity for violence at all until the shooting occurred.

{¶61} After reviewing the evidence in a light most favorable to Plaintiffs, we conclude the trial court correctly granted summary judgment in favor of the Chardon School Employees. We are very mindful that what took place at Chardon High School is nothing less than tragic; what was lost that day can never be replaced. The evidence upon which Plaintiffs rely simply does not create a genuine issue of material fact concerning whether the School Employees acted in bad faith or engaged in conduct that was malicious, wanton, or reckless.

{¶62} Plaintiffs' second assignment of error is without merit.

25

{¶63} As we have found no basis upon which to reverse the trial court's judgment, we decline to review Chardon School Employees' cross assignment of error regarding Lane's actions as the sole proximate cause of Plaintiffs' injuries and damages. *See* R.C. 2505.22. Additionally, because we conclude the Chardon School Employees are entitled to statutory immunity, we need not address their argument that they owed no legal duty to Plaintiffs to prevent Lane's criminal actions.

{¶64} The judgment of the Lake County Court of Common Pleas is hereby affirmed.

CYNTHIA WESTCOTT RICE, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents.