[Cite as *End the Noise Inc. v. Kirtland Country Club Co.*, 2021-Ohio-3474.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| END THE NOISE INC., | **CASE NO. 2020-L-107** |
| Plaintiff-Appellant/<br>Cross-Appellee, | |
| | Civil Appeal from the<br>Court of Common Pleas |
| - v - | |
| KIRTLAND COUNTRY CLUB<br>COMPANY, et al., | Trial Court No. 2019 CV 000504 |
| Defendants-Appellees/<br>Cross-Appellants, | |
| CITY OF WILLOUGHBY, et al., | |
| Defendants-Appellees. | |

## **O P I N I O N**

Decided: September 30, 2021
Judgment: Affirmed

*David L. Harvey, III*, and *Matthew B. Abens*, Harvey + Abens Co., LPA, 19250 Bagley Road, Suite 102, Middleburg Heights, OH 44130 (For Plaintiff-Appellant/Cross-Appellee).

*Karen Soehnlen McQueen*, *John P. O'Neil*, and *James M. Williams*, Krugliak, Wilkins, Griffiths & Dougherty Co., LPA, 4775 Munson Street, N.W., Canton, OH 44718 (For Defendants-Appellees/Cross-Appellants).

*Michael C. Lucas,* City of Willoughby Law Director, One Public Square, Willoughby, OH 44094 (For Defendants-Appellees).

MATT LYNCH, J.

{¶1} Plaintiff-appellant/cross-appellee, End the Noise Inc., appeals from the decision of the Lake County Court of Common Pleas, granting summary judgment in favor of defendants-appellees/cross-appellants, Kirtland Country Club and Kirtland Country Club Company, and defendants-appellees, the City of Willoughby and Chief Building Inspector Darryl Keller. For the following reasons, we affirm the decision of the lower court.

{¶2} On March 25, 2019, ETN filed a Complaint against KCC, KCCC, Willoughby, and Keller. The Complaint alleged that skeet shooting operations being conducted at the Kirtland Country Club were not in compliance with the terms of a 2015 Conditional Use Permit. The Complaint requested a declaratory judgment and preliminary and permanent injunctive relief and sought, inter alia, that the court declare KCC and KCCC had violated the Conditional Use Permit and award injunctive relief requiring Willoughby to enforce the terms of the CUP and the city's zoning laws.

{¶3} KCC and KCCC filed a Motion to Dismiss on April 26, 2019. Therein, they sought dismissal on the grounds that ETN lacked standing as it failed to plead facts showing a particularized injury or that the club caused injuries. It further alleged that ETN failed to state a claim upon which relief may be granted pursuant to Civ.R. 12(B)(6). ETN filed a brief in opposition on May 13, 2019.

{¶4} Willoughby and Keller filed an Answer on April 30, 2019.

{¶5} The trial court issued an Opinion and Judgment Entry on July 15, 2019, denying the Motion to Dismiss. KCC and KCCC subsequently filed their answer.

2

Case No. 2020-L-107

{¶6} On November 15, 2019, ETN filed a Motion for Preliminary and Permanent Mandatory Injunction.

{¶7} KCC and KCCC filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, on March 6, 2020. As grounds to dismiss, they cited a section of the Ohio Revised Code that had gone into effect two months prior, R.C. 9.68, for the proposition that it preempted any local firearm regulations. As to summary judgment, they argued that they complied with all of the conditions of the CUP.

{¶8} ETN filed a Motion for Summary Judgment on March 31, 2020, arguing that KCC was not the proper CUP holder and the club did not comply with the terms of the CUP by allowing trapshooting and because the skeet range is not properly oriented.

{¶9} Willoughby and Keller filed a Motion for Summary Judgment on April 1, 2020, arguing that the terms of the CUP were not being violated.

{¶10} The following evidence was presented through the summary judgment motions:

{¶11} Mark Petzing, the general manager and Chief Operating Officer for the Kirtland Country Club, described that KCCC owns the property where the club is located and is a registered corporation but the letterhead, checks, and some permits are in the name of "Kirtland Country Club." KCC is not registered as a dba, doing business on behalf of KCCC, and does not file separate tax returns or have a separate board of directors.

{¶12} Petzing testified that in 2014, there were discussions within the club to offer skeet shooting as an activity to members. Arthur Baldwin, a past club president,

3

discussed this matter with the mayor of Willoughby. Trial shoots were conducted in early 2015 with city officials present. One such shoot took place in the area where the range is currently located. An email from mayor David Anderson, who was present during the second shoot, stated that the site "by the tennis courts shooting towards Kirtland" was "the only site that I could support."

{¶13} Baldwin submitted an application for a Conditional Use Permit dated June 19, 2015, which stated the request was made on behalf of "Kirtland Country Club," also noted to be the property owner. The application proposed use of the property for the "operation of a seasonal skeet range." Included were a photo showing the proposed area for the skeet range with the location of the test shootings and "anticipated extent of the shot patterns" and photos showing the distance of the range to nearby residential developments. It also included an illustration of the skeet range with shooter stations and the general location of a high and low house, buildings used to launch clay pigeons or targets for shooting, and a "skeet field definitive drawing" which showed the size and general orientation of the skeet field placed over an image of the area where it would be located. Also included were notes on a shooting sound test conducted by HzW Environmental Consultants, stating the sound level at various locations.

{¶14} Pursuant to the meeting minutes of the Willoughby Planning Commission's July 9, 2015 hearing, Baldwin represented that there would be a high and a low "tower" and eight stations for shooting. Commission members questioned him about noise abatement and inquired about plans of the specific range location. Meeting minutes from July 23, 2015, stated that a representative from HzW appeared and discussed a sound

4

study conducted at three locations. The meeting minutes listed "conditions agreed on," which are substantially similar to those contained in the approved CUP.

{¶15} On October 26, 2015, a letter was sent to Baldwin and KCC approving the request for the CUP. The CUP was granted to "Kirtland Country Club," listed the address, and stated that the permit "is to be used for: SEASONAL SKEET RANGE" subject to the following conditions:

> 1. Hours of operation:
> 10:00 a.m. until 4:00 p.m. – Saturdays.
> 12:00 noon until 4:00 p.m. – Sundays.
> 2. The skeet shooting season shall be November 1 through March 31.
> 3. The shotgun sizes permitted are: 12-gauge, 20-gauge, 28-guage and possibly others. Nothing is permitted higher than 12-gauge.
> 4. Skeet shells shall be used.
> 5. The skeet range location is where the star is located on the Google aerial printout that is part of the HZW Environmental report of the findings of the sound level meter testing depicting the Kirtland Country Club's skeet shooting range.
> 6. The skeet shooting shall be reviewed after the end of the first season.
> 7. A berm will be installed around the rear perimeter on the north side that will direct noise south toward Kirtland and away from Tudors Estate.

It provided that violation of these conditions shall be grounds for revocation or suspension of the permit.

{¶16} Petzing testified that after the issuance of the CUP, club members were able to conduct skeet shooting subject to member rules and were permitted to purchase or bring their own ammunition and rent firearms. In response to an inquiry as to whether trap or skeet shooting was being conducted, Petzing testified that he believed skeet and trapshooting are "kind of one in the same, really. I think skeet is defined as trapshooting in which birds are * * * thrown to mimic birds of flight." He continued: "We don't – I mean,

5

I guess it's kind of like different, you know, everything we kind of considered as skeet" and stated they do not have a "formalized trap field." He noted that they have "trap houses" on the skeet field and explained his belief that it is industry standard for clays to be thrown from trap houses for skeet shooting. Various documents were presented which showed the club made references to "trap" or "trap events", including: August 19, 2015 meeting minutes of the Board of Directors, wherein the president discussed that the "goal is to begin to shoot this fall beginning with trap"; a November 2015 job description for the Kirtland range manager, whose duties included overseeing a "trap range/skeet field and a 5 stand course"; Trap and Skeet Committee Meeting Minutes with a 2018/2019 schedule including a February 23 "Trap 50" event; a December 11, 2018 email referencing an "Annie Oakley Tournament – Wobble Trap Targets – 1st time EVER!," and a February 27, 2019 email to club members discussing a "fun shoot" with "one round of skeet and one round of trap." Petzing testified that these events were a different version of shooting skeet, described one as a "modified trap event," and explained that they use "trap as different vernacular because you're still shooting in multiple different directions, but we don't have an actual trap field."

{¶17} The affidavit and expert report of Paul Taylor were provided regarding the type of shooting being conducted at the club. Taylor cited as his expertise, inter alia, his 39-year history as a skeet shooter and positions as president of skeet ranges. He described that the "word 'skeet' is used widely as a generic term to describe/represent the shooting of moving clay targets." He cited to the Merriam-Webster dictionary defining

6

skeet as "trapshooting in which clay pigeons are thrown."[1] He concluded that: "Per the Kirtland Country Club Conditional Use Permit, they have unequivocally constructed a 'textbook' skeet range." He explained that: "In accordance with the basic fundamentals of skeet, the clay targets are thrown from a number of different configurations from the range." Taylor concluded the following: "My inspection of the range and review of the above materials, along with my background, training and experience, clearly establish in my opinion that the Kirtland Country Club fully complied with the terms of the Conditional Use Permit. The organization and management of the Kirtland Country Club's skeet range, as well as the high degree of oversight by seasoned range officers, are exemplary."

{¶18} Regarding the skeet shooting field or range, Petzing testified that the club had cleared the area of trees to allow for shooting, built a shooting deck, and installed a berm/mound that was 6 to 8 feet high and has been made larger over time. When shooting began in 2015, the club had multiple mobile "throwers" in place to throw the clay pigeons from various locations and shooters would fire in "different ways" depending upon the direction of the clay pigeons.

{¶19} Around the fall of 2016, Petzing became aware of complaints from residents in the area regarding the noise, contacted professionals about how to mitigate sound, and the club lowered the range by digging to help with mitigation. Following a "work session"

---

1. Although ETN asserts that the CUP was violated due to the club conducting trapshooting in addition to skeet shooting, there is little in the record to demonstrate a definition of trapshooting as opposed to skeet shooting. As an exhibit to its reply in defense of its motion for preliminary injunction, ETN attached an article from NRA Shooting Sports USA which describes skeet as a shooting sport in which two target throwing houses throw clay targets meeting at a midpoint between the houses and trapshooting as a sport where a single throwing machine shoots clay targets at a variety of angles on either side of a line between the center of the trap and the center shooting station.

7

Case No. 2020-L-107

with the city, the club submitted an amended CUP, which included additional conditions that the "skeet shooting platform will be pointed in an easterly direction" and to add a shooting pavilion with mounding and recess. On October 20, 2016, the Planning Commission of the City of Willoughby held a meeting to consider the amended CUP, denied a motion to accept the amended CUP, and revoked the existing CUP. The club filed an appeal with the Lake County Court of Common Pleas. In a March 2017 Judgment Entry, the court held that the decision to revoke the CUP was not supported by the preponderance of substantial, reliable and probative evidence and vacated the permit revocation.

{¶20} Pursuant to April 2017 club meeting minutes, the club discussed making improvements to the skeet shooting range. In September 2017, a proposal for a change in the range was discussed, which would result in a 90-degree rotation in shooting direction to the east. Petzing testified that this was not implemented, and stated that the range faces southeast and has always faced in that direction. Petzing testified that the club did not believe the CUP required orientation of the range in a specific direction. Gary Sopnicar, a range safety officer at the Kirtland Country Club, stated in his affidavit that the range was located where the star is on the Google printout which was part of a HzW environmental report. He stated that a berm had been installed near the perimeter on the north side to direct noise south away from the Tudors Estates and that the club has at all times complied with the terms of the CUP. Taylor also confirmed the same location of the range and the installation of the berm.

{¶21} Darryl Keller, the Chief Building and Zoning Inspector for the City of

Case No. 2020-L-107

Willoughby, stated in his affidavit that he was not aware of any violations of the CUP. He had not seen any evidence of the assertion that trap rather than skeet shooting is done at the club. As to construction of buildings on the skeet shooting site, he stated that a permit would not be required to construct such buildings under the building code. He also stated that "[t]he CUP does not require a particular orientation of the skeet range, only that the skeet range location is where the star is located on the Google aerial printout."

{¶22} On October 9, 2020, the court issued an Opinion and Judgment Entry. The court found the motion to dismiss was untimely since it was filed seven months after KCC's answer but found the arguments contained therein would be addressed along with its other summary judgment arguments. It denied ETN's motion to strike the affidavit and report of Taylor. It found that Taylor had specialized knowledge and experience in the area of construction of a skeet shooting range, his affidavit did not contain impermissible legal conclusions, and made conclusions useful in helping the fact-finder determine the issues. Evid.R. 702.

{¶23} As to the application of R.C. 9.68, the court found KCC's interpretation was overbroad, noting that it did not render all regulation of firearms inapplicable. The court found the CUP applicable to KCC, noting the evidence showed KCC and KCCC operated as essentially the same entity. The court found that there was no evidence to demonstrate any conditions of the CUP were violated and rejected the arguments that the skeet range was not properly oriented and that trapshooting was impermissible, finding no CUP provisions stating such requirements.

{¶24} We will first address ETN's assignments of error:

9

{¶25} "[1.] The trial court erred in ruling that KCC is a valid holder of the CUP as a matter of law.

{¶26} "[2.] The trial court erred in granting the Club's [motion for] summary judgment.

{¶27} "[3.] The trial court erred in denying Appellant's motion to strike the Club's expert affidavit and report.

{¶28} "[4.] The trial court erred in granting the City and Keller summary judgment."

{¶29} Pursuant to Civil Rule 56(C), summary judgment is proper when (1) the evidence shows "that there is no genuine issue as to any material fact" to be litigated, (2) "the moving party is entitled to judgment as a matter of law," and (3) "it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor."

{¶30} A trial court's decision to grant summary judgment is reviewed by an appellate court under a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision." *Peer v. Sayers*, 11th Dist. Trumbull No. 2011-T-0014, 2011-Ohio-5439, ¶ 27.

{¶31} In its first assignment of error, ETN argues that the court erred in rejecting its contention that the CUP could not be held by KCC under Willoughby Codified Ordinance 1109.05, and thus should be invalidated, because it is an unregistered

10

Case No. 2020-L-107

business entity.

{¶32} Pursuant to W.C.O. 1109.05(b): "The owner, or agent thereof, of property for which such conditional use is proposed shall file with the Building and Zoning Inspector an application for a conditional use permit accompanied by payment of the required fee established by Council." W.C.O. 1109.05(i) sets forth that the conditional use permit is nonassignable, the "breach of any condition, safeguard or requirement shall automatically invalidate the conditional use permit granted, and shall constitute a violation of the Planning and Zoning Code" and such permit "shall be valid only to the applicant to whom the permit is issued, unless a transfer of such permit has been approved by the Building and Zoning Inspector."

{¶33} As a preliminary matter, appellees argue that, regardless of the merits of this claim, it is barred by the law of the case doctrine because, in a prior lawsuit and administrative appeal before the Lake County Court of Common Pleas, "the trial court did not rule Kirtland Country Club to be incapable of holding the CUP, or incapable of initiating an action."

{¶34} The law of the case doctrine provides that "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). This doctrine "is applicable only to proceedings in the *same* case and does not limit the actions of a court in another case, even if that case has a party in common with the other case." *Reid v. Cleveland Police Dept.*, 151 Ohio St.3d 243, 2017-Ohio-7527, 87 N.E.3d 1231, ¶ 9. In the present matter, the proceedings which

11

appellees argue are the law of the case took place in a separate matter in 2017 between KCC and the Planning Commission and did not involve ETN. ETN was unable to argue this point given it was not a party and appellees provide no support for the proposition that the court's judgment in the separate case is fairly applicable under these circumstances. Further, a review of the court's 2017 judgment shows that the issue of the proper holder of the CUP was not raised and thus, even if the rule of the case doctrine were applicable, this specific issue was not resolved.

{¶35} In the present matter, the application for the CUP was made by Baldwin on behalf of "Kirtland Country Club." The permit was issued to "Kirtland Country Club." The property upon which the club is located is owned by "Kirtland Country Club Company." While recognizing that this is a summary judgment proceeding, there does not appear to be a particular dispute about the facts but, rather, a legal question about whether a permit issued in the name of Kirtland Country Club is valid under the ordinance since, pursuant to ETN's argument, the owner of the property must be the holder of the permit. We agree with the lower court's finding that the CUP is valid as issued.

{¶36} Here, the permit is properly held by KCCC. The CUP and its terms were specific to the property location owned by KCCC and significant review of the property and the range location were conducted when issuing the permit. It is evident that all parties referred to the entire entity as "Kirtland Country Club," which includes the Kirtland Country Club Company. The CUP application, subsequent meeting minutes, and the letter accompanying the permit demonstrate that the name "Kirtland Country Club" was used throughout the application process, although the permit was sought for use of the

Case No. 2020-L-107

property owned by KCCC. As was testified to by Petzing, without any contrary evidence presented, the business essentially operated as though KCCC and KCC were considered one and the same, with the KCC name being utilized in day-to-day business operations such as writing checks and included on the letterhead. The permit application proceedings were consistent with how the business operated. There is nothing to evidence that the city intended to grant the permit to an entity other than the property owner.

{¶37} There is no dispute that KCCC regularly does business under the name of KCC. Its conduct constitutes operating under a "fictitious name," i.e., "a name used in business or trade that is fictitious and that the user has not registered or is not entitled to register as a trade name." R.C. 1329.01. "A corporation may use a name other than its corporate name in the conduct of its business" and may conduct business under a fictitious name. (Citation omitted.) *Plain Dealer Publishing Co. v. Worrell*, 178 Ohio App.3d 1009, 2008-Ohio-4846, 898 N.E.2d 1009, ¶ 16 (9th Dist.); *see LaMusga v. Summit Square Rehab, LLC*, 2017-Ohio-6907, 94 N.E.3d 1137, ¶ 27-28 (2d Dist.). The use of a fictitious name in doing business has been found permissible to conduct various business activities including executing contracts with parties, taking title to a property, and making and receiving payments from entities such as clients and employees. *Plain Dealer* at ¶ 13-17; *Woods v. Marcano*, 2018-Ohio-4324, 122 N.E.3d 633 (8th Dist.) ("a deed to a fictitious name is really a deed to the person operating under the fictitious name"); *see LaMusga* at ¶ 27-28. ETN fails to present any convincing argument as to how receiving a permit in a fictitious name varies from those circumstances listed above, in particular,

13

from a contract. In both situations, the company or business using the fictitious name agrees to comply with certain obligations to receive a benefit.

{¶38} While ETN takes exception in particular with the fact that KCC is not registered with the Secretary of State as a fictitious entity doing business on behalf of KCCC and asserts that it is a nonexistent separate entity that cannot hold a permit, we do not find the lack of registration to be a bar to receiving a permit. It has been held that, both in the context of fictitious and trade names, failure to register has the consequence of preventing a person from commencing or maintaining an action under the fictitious or trade name until it is registered, but does not prevent a business from conducting general operations in the fictitious name. *LaMusga* at ¶ 27; *Koudela v. Johnson & Johnson Custom Builders, LLC,* 11th Dist. Lake No. 2017-L-024, 2017-Ohio-9331, ¶ 14 (failure to register a trade name related to maintaining an action in court and thus, the fact that the trade name was not registered as "doing business as" did not prevent it from being used to enter into a contract). *Woods, supra*, cited by ETN in favor of the foregoing argument, held that the plaintiff had the right to operate under a fictitious name, take title to property, and sue to enforce contracts entered in that name where the plaintiff had reported the fictitious name to the Secretary of State. However, *Woods* is distinguishable on this ground since it did not specifically address the outcome in a matter where the party had not registered a fictitious name given that registration was not at issue. Further, to the extent ETN cites *Woods* and *Thomas v. Columbus*, 39 Ohio App.3d 53, 528 N.E.2d 1274 (10th Dist.1987), for the proposition that a conveyance requires a fictitious name to be registered, a conveyance of property is distinguishable from a permit which allows parties

14

to use land for a particular purpose upon certain conditions, with similarities to entering a contract as described above. Having to comply with certain terms to use a property in a specific manner is not the same as entering into an agreement to sell real estate and is subject to a process and laws that differ from executing a real estate transaction. Finally, we emphasize that, as noted above, it is clear there was no confusion among the city as to what entity the permit was being issued to and who would be operating the skeet shooting range as KCC and KCCC essentially functioned as one entity. Since KCC is not a separate entity, a permit in its name would still be applicable to KCCC.

{¶39} Further, consistent with the foregoing and even presuming the above fictitious name analysis was not applicable, the failure to include the full name of a business entity has not been found to invalidate legal obligations incurred by a business. The fact that the application for the permit and the permit issued do not include the word "company" does not prevent a determination that the permit applies to the property owned by KCCC. As was held in *Perk v. Tomorrows Home Solutions, L.L.C.*, 8th Dist. Cuyahoga No. 104270, 2016-Ohio-7784, it is not required that a company like an LLC always use this designation when entering into an agreement such as a contract, particularly where the parties entering the agreement are evident. *Id.* at ¶ 10 ("the fact that THS did not use the L.L.C. designation on its contract with Perk is not dispositive of the validity of the contract between him and THS"). *See also The Promotion Co., Inc./Special Events Div. v. Sweeney*, 150 Ohio App.3d 471, 2002-Ohio-6711, 782 N.E.2d 117, ¶ 25 (7th Dist.). While we recognize in this instance the parties did not enter into a contract but a permit was granted, we find it is still instructive in that the failure to include "company" should not

15

be fatal under circumstances where it is clear what entity was being referenced.

{¶40} ETN's first assignment of error is without merit.

{¶41} In the second assignment of error, ETN argues that the trial court erred in concluding the club did not violate the CUP for several reasons.

{¶42} First, ETN contends that while the authorized conditional use under the CUP was "skeet shooting," the club conducted trapshooting which fell outside of that use, violating the requirement in W.C.O. 1109.05(i) that a conditional use permit "shall be deemed to authorize a particular conditional use on a specific parcel for which it was approved."

{¶43} We do not find that there was a genuine issue of fact created by ETN as to its argument that "trap" shooting was not permissible under the permit. ETN did not present evidence demonstrating the meaning of the term skeet shooting as included in the permit or refute with evidence the defendants' argument that it included trapshooting activities. Taylor, an expert in the field, stated that the "word 'skeet' is used widely as a generic term to describe/represent the shooting of moving clay targets." There is no question that trapshooting involves the shooting of moving clay targets, which, under Taylor's description, would fall under the permit's allowance of skeet shooting. Keller, the city inspector, also emphasized the definition of skeet as including clay targets thrown from traps. Petzing testified as to the club's belief that trap and skeet shooting included the same activity of shooting clay pigeons. Further, the dictionary definition of skeet shooting is "the sport of shooting at targets (called clay pigeons) that are thrown in the air" which is the conduct taking place at the club. *See* Merriam-Webster Online,

16

https://www.merriam-webster.com/dictionary/skeet%20shooting (accessed September 22, 2021).

{¶44} Further, there is a lack of evidence in the record to show a specific instance where an event was conducted that fell outside of the term "skeet shooting." While ETN cites to various evidence that the events have been referred to as "trap shooting," this does not actually demonstrate whether events were conducted in a manner that differs from the general definition of skeet shooting as outlined above. The club did admit that on one occasion a "modified trap event occurred" but, again, ETN did not prove what this modified event consisted of to demonstrate it included activity outside of that permitted by the permit.

{¶45} Next, ETN argues that the court erred in finding the CUP did not require a specific orientation of the range and that the range had retained the same general direction from the start, contending that there is at least a genuine issue of material fact as to these issues. ETN contends that the range was required to be oriented south.

{¶46} A reading of the plain language of the terms of the CUP does not address the orientation of the range except to state that the skeet range must be placed "where the star is located on the Google aerial printout that is part of the HZW Environmental report of the findings of the sound level meter testing depicting the Kirtland Country Club's skeet shooting range." Both Taylor and Sopnicar attested that the range was placed in this location. ETN does not demonstrate there is an issue of fact as to whether this condition was met.

{¶47} ETN contends that since the CUP required the berm to be placed on the

17

rear perimeter on the north side, this requires the range to face south. However, the permit does not state such a restriction. While ETN cites factors for construing the language of the permit in the event that it is ambiguous, we do not find its terms to be ambiguous as they are plainly stated. It is unnecessary to consider factors to resolve this issue when there is no ambiguity. ETN requests that a term be read into the CUP that simply is not there; we cannot find additional requirements by inferring that they may be a logical extension of those actually contained in the CUP. Had the parties intended for there to be additional conditions on the use of the land for skeet shooting, they should have been included in the permit. To the extent that ETN highlights various pieces of information presented to the planning board during the permit process, including sound tests and drawings of the range, showing that the range would best be oriented south, the same analysis applies. Discussions had prior to the issuance of the permit do not dictate what conditions must be followed in using the permit, the permit itself does.

{¶48} In relation to the berm, both Taylor and Sopnicar confirmed that it was installed in the location on the north side. Even considering the argument that the berm condition meant the range needed to be constructed facing south for the berm to be effective, Petzing testified that it had always faced in a southeast direction which would presumably make the berm useful in deflecting noise.

{¶49} Finally, ETN argues that the court erred in determining that the range had faced in the same general direction since installed. For the reasons discussed above, resolution of this fact is unnecessary to determine whether a violation of the CUP occurred. Nonetheless, we note that, although ETN points to evidence showing the club

Case No. 2020-L-107

discussed moving the range, evidence of potential changes considered by the club in the years after the issuance of the CUP does not demonstrate they actually made such changes. Petzing testified that although such changes were considered, the range has continually faced in a southeast direction; ETN presents no evidence to show this is not the case.

{¶50} ETN's second assignment of error is without merit.

{¶51} In its third assignment of error, ETN argues that the lower court improperly allowed Taylor to offer expert testimony since he failed to establish his credentials, opined on the law, and certain documents were not attached to the expert report.

{¶52} Generally, "[t]rial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 16. "[A]n abuse of discretion is the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" *Ivancic v. Enos*, 2012-Ohio-3639, 978 N.E.2d 927, ¶ 70 (11th Dist.), citing *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11. "[W]here the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error." (Citation omitted.) *Ivancic* at ¶ 70.

{¶53} Evid.R. 702 provides that a witness may testify as an expert if all of the following apply: "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common

19

among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶54} ETN takes issue with the proof of Taylor's qualifications under Evid.R. 702(B), arguing that "courts have required more than just a brief example of the proposed expert's qualifications, requiring instead the expert to attach at least a curriculum vitae to his report."  In support of this proposition, it cites *Douglass v. Salem Community Hosp.*, 153 Ohio App.3d 350, 2003-Ohio-4006, 794 N.E.2d 107 (7th Dist.), and *Pieper v. Williams*, 6th Dist. Lucas No. L-05-1065, 2006-Ohio-1866.

{¶55} Neither *Douglass* nor *Pieper* support a holding that courts must require a curriculum vitae to find a witness demonstrated their qualifications as an expert under Evid.R. 702(B).  In *Douglass*, the Seventh District held that the lower court properly determined it could not rely on the curriculum vitae submitted to establish expert qualifications because it was not properly submitted and further held that the deposition testimony of the expert demonstrated he did not have expertise related to the issues involved in the case.  *Id.* at ¶ 22-38.  In *Pieper*, the Sixth District held that the lower court "was well within its discretion in refusing to permit [the witness] to offer expert opinion" where he lacked "properly verified credentials" given that when he "wished to establish his expertise as a security consultant, he relied upon his resume and curriculum vitae which were initially not attached to his [affidavit]."  *Id.* at ¶ 30.  In both *Douglass* and *Pieper*, the appellate courts did not hold that a curriculum vitae was required to prove

Case No. 2020-L-107

expert qualifications but, rather, upheld the lower court's decision to exclude expert testimony as not being an abuse of discretion. Finding a lack of an abuse of discretion is not the same as an affirmative holding that a trial court was required to make the determination that it did.

{¶56} We find no abuse of discretion in the lower court's determination that Taylor was qualified as an expert witness on the grounds of specialized knowledge, skills, expertise and training. As to Evid.R. 702(B)'s requirement to demonstrate "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony," Taylor's report, attached to his affidavit, provided that he had a 39-year history as a skeet shooter, served as a skeet shooting referee, managed multiple skeet shooting ranges, was a nationally-classified shooter, and had won a state championship title. We find no error in determining these were acceptable qualifications to be an expert in skeet shooting, nor do we find a basis supported in law to hold that such qualifications must be set forth in a separate document called a curriculum vitae to be acceptable to demonstrate his credentials. There was sufficient information about Taylor's qualifications in his expert report present to make a determination that he was an expert and placing this into a separate document titled a resume or curriculum vitae does not "authenticate" the information more than stating it directly in the expert report.

{¶57} ETN next argues that Taylor improperly offered his opinion as to whether the terms of the CUP were met by the club, which is a legal issue and the ultimate issue to be resolved by the court. *See State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039, ¶ 77 (the ultimate issue was a factual question for the jury to resolve rather

21

than the expert); *Lang v. Beachwood Pointe Care Ctr.*, 2017-Ohio-1550, 90 N.E.3d 102, ¶ 42 (8th Dist.) (prohibiting "an expert's interpretation of the law" as testimony).

{¶58} Taylor, as an expert, offered his opinion on whether the activity conducted by the club was consistent with what was permissible under the CUP, basing this opinion on what constituted skeet shooting, how the skeet field was oriented, and other pertinent information. He was not opining on an interpretation of the law, as was the case in *Lang*. Nonetheless, even if it were found that Taylor improperly made a statement regarding the application of the law, there is nothing in the record to show that it influenced the court's ruling on summary judgment or that the court failed to determine the issues based on its own consideration and interpretation of the law. While an opinion as to whether the CUP was violated relates to the ultimate issue in this case, an expert can provide an opinion as to an ultimate issue of fact if it requires application of expert knowledge. *State Auto Mut. Ins. Co. v. Chrysler Corp.*, 36 Ohio St.2d 151, 162, 304 N.E.2d 891 (1973); *Parmertor v. Chardon Local Schools*, 2019-Ohio-328, 119 N.E.3d 436, ¶ 31 (11th Dist.). As noted above, Taylor's conclusion relating to whether the CUP was violated arose from his knowledge of various issues relating to skeet shooting and skeet ranges. We find no error in the court allowing his testimony and utilizing it to the extent necessary to reach its determination on summary judgment.

{¶59} ETN also contends that the expert report should have been stricken because it did not have attached to it all of the papers referred to in the report, citing Civ.R. 56(E), which requires that "[s]worn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit."

22

Case No. 2020-L-107

{¶60} The expert report, attached to Taylor's affidavit, stated that he had reviewed various materials in issuing the report, including the complaint, answer, permit, discovery responses, a visit to and inspection of the range, and affidavits from safety range officers. Under ETN's argument, Taylor would be required to attach all of these materials to his affidavit, although most of the materials were already placed in the record at least one if not multiple times. We do not find that Civ.R. 56(E) requires an expert to attach everything provided in discovery, the complaint, the answer, and other related materials to the expert report. His reference to consideration of materials already in the record gives notice of what materials were reviewed. *See Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.,* 110 Ohio App.3d 732, 739, 675 N.E.2d 65 (2d Dist.1996) ("a party may attach affidavits setting out experts' opinions as long as the predicate facts on which the opinions are based have been separately attested to or authenticated and are also attached to the motion for or memorandum in opposition to summary judgment"). While it is accurate that the report references the review of "affidavits" of safety range officers and there is only one affidavit from a worker at the club range, we do not find that the failure to attach this document, if one exists, means that the lower court's decision to admit the expert report was an abuse of discretion. The conclusions considered in granting summary judgment are unrelated to range safety and testimony of "safety range officers" is not specifically referenced as a basis for any pertinent conclusions reached in the report.

{¶61} Finally, ETN contends that Taylor did not offer testimony opining on matters beyond that which a lay person could have given and, thus, his testimony was not expert testimony, emphasizing his reference to a dictionary to define skeet and his lack of

23

testimony as to technical matters. As stated in Evid.R. 702(A), one of the conditions for a witness to testify as an expert is that his testimony "either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons." Issues such as what falls under the term "skeet," whether the range is consistent with a typical skeet range, and even whether the range is run properly, are not those about which a lay person would have knowledge. A person experienced in the field of sport shooting has knowledge that can aid in the understanding of these issues.

{¶62} ETN emphasizes Taylor's reference to a dictionary definition as evidence of the non-expert nature of his testimony. We do not find that a reference to a dictionary definition renders his testimony that of a lay witness or invalidates it in any manner. Regardless of whether he included a dictionary definition, he specifically opined that the "word 'skeet' is used widely as a generic term to describe/represent the shooting of moving clay targets" and that the range was "textbook skeet," which was information consistent with his experience in the field. While ETN argues that Taylor must be an engineer to offer a statement regarding whether the skeet range was "textbook," it is clear from this opinion that he was explaining whether it was consistent with the type of range utilized in the sport, not whether it was structurally sound or otherwise properly constructed from an engineering point of view. It is evident that he is aware of the setup of a skeet range and how it functions based on his experience; he was not testifying as to specialized construction or engineering knowledge.

{¶63} ETN's third assignment of error is without merit.

{¶64} In its fourth assignment of error, ETN argues that the foregoing assignments

24

Case No. 2020-L-107

apply equally to Willoughby and Keller and thus, reversal of summary judgment in favor of KCCC and KCC requires reversal against them as well. For the reasons stated above, we find no merit in the arguments raised by ETN and we apply the foregoing analysis here as to Willoughby and Keller.

{¶65} ETN's fourth assignment of error is without merit.

{¶66} In their cross-appeal, KCC and KCCC raise the following assignment of error:

{¶67} "The trial court erred in failing to dismiss the case."

{¶68} KCC and KCCC filed a motion to dismiss below, asserting that R.C. 9.68 invalidated any restrictions under the permit. The trial court found that this was not properly raised in a motion to dismiss but rejected the merits of the argument in its analysis on the motions for summary judgment. While this issue is raised on cross-appeal as grounds to reverse and order the lower court to enter a judgment dismissing ETN's complaint, we find it unnecessary to consider the merits of this argument. For the reasons outlined above, judgment was properly entered in favor of the defendants. We need not consider whether dismissal was proper given that the outcome favored the defendants. *See Emerson Family Ltd. Partnership v. Emerson Tool, L.L.C.*, 9th Dist. Summit No. 26200, 2012-Ohio-5647, ¶ 24 (consideration of the argument regarding the court's failure to grant the defendant's motion to dismiss was necessary "because [the] Court reverse[d] summary judgment" granted in the defendant's favor). It is unnecessary to consider another justification for such an outcome in light of the foregoing.

{¶69} The cross assignment of error is without merit.

Case No. 2020-L-107

{¶70} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, granting summary judgment in favor of the defendants, is affirmed. Costs to be taxed against the parties equally.

MARY JANE TRAPP, P.J.,

THOMAS R. WRIGHT, J.,

concur.

Case No. 2020-L-107